CLERK'S OFFICE
A TRUE COPY
Dec 18, 2020
s/ Jeremy Heacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

for the

Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) ) |
| Information related to the AT&T cellular telephone assigned call number (626) 991-9105, (the Target Cell Phone 2) | ) ) ) ) |

Case No. **20-M-493 (SCD)**

Matter No.: 2020R00374

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search and seizure of the following person or property located in the _____ District of _____
*(identify the person or describe the property to be searched and give its location)*:

See Attachment A. This Court has jurisdiction pursuant to 18 U.S.C. §§2703 and 2711 and Fderal Rule of Criminal Procedure 41;

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

See Attachment B.

**YOU ARE COMMANDED** to execute this warrant on or before ___1-1-21___ *(not to exceed 14 days)*
❑ in the daytime 6:00 a.m. to 10:00 p.m.   ☑ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to ___Hon. Stephen C. Dries___ .
*(United States Magistrate Judge)*

☑ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial) and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*
☑ for _30_ days *(not to exceed 30)*   ❑ until, the facts justifying, the later specific date of _____ .

Date and time issued:     ___12-18-20. 11:20 am___

City and state:     ___Milwaukee, Wis___

_Stephen C. Dri_
*Judge's signature*

Stephen C. Dries, U.S. Magistrate
*Printed name and title*

## Return

| Case No.: | Date and time warrant executed: | Copy of warrant and inventory left with: |
|---|---|---|
| | | |

Inventory made in the presence of :

Inventory of the property taken and name(s) of any person(s) seized:

## Certification

      I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: _____

_____
*Executing officer's signature*

_____
*Printed name and title*

## ATTACHMENT A

### Property to Be Searched

1. Records and information associated with the cellular device assigned call number (626) 991-9105 (referred to herein and in Attachment B as "the Target Cell Phone 2"), with listed subscriber(s) Erica Adupoku that is in the custody or control of AT&T, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered 11760 US Highway One, 6th Floor, North Palm Beach, FL 33408.

2. The Target Cell Phone 2.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I.      Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.   The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone 2 for the time period **September 17, 2020 through present:**

   i.   Names (including subscriber names, user names, and screen names);

   ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

   iii.   Local and long distance telephone connection records;

   iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

   v.   Length of service (including start date) and types of service utilized;

   vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

   vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

   viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

2

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone 2, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone 2 for a period of up to 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone 2 will connect at the beginning and end of each communication, as well as per-call measurement data.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone 2.

c. Information about the location of the Target Cell Phone 2 for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell

Phone 2 on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II. Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of  21 U.S.C. §§ 841 and 846 , involving Jose AVILA, Andrew ADUPOKU and unidentified subject(s) during the period September 17, 2020 through present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.



CLERK'S OFFICE
A TRUE COPY
Dec 18, 2020
s/ JeremyHeacox
Deputy Clerk, U.S. District Court
Eastern District of Wisconsin

# UNITED STATES DISTRICT COURT

## for the

### Eastern District of Wisconsin

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched*<br>*or identify the person by name and address)*<br>Information related to the AT&T cellular telephone<br>assigned call number (626) 991-9105, (the Target Cell<br>Phone 2) | ) ) ) ) ) ) |

Case No. **20-M-493 (SCD)**

Matter No.: 2020R00374

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

See Attachment A. This Court has jurisdiction pursuant to 18 U.S.C. §§2703 and 2711 and Fderal Rule of Criminal Procedure 41;

located in the _____ District of _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☐ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 841(a) | Manufacture, distribute or dispense, or possess with intent to manufacture, distribute or dispense a controlled substance; |
| 21 U.S.C. §§ 846 | Conspiracy to distribute controlled substance(s) |

The application is based on these facts:

See Affidavit attached.

☑ Continued on the attached sheet.

☑ Delayed notice of __30__ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

TFO Brian Ploch
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____Telephone_____ *(specify reliable electronic means).*

Date: 12-18-20

_____
*Judge's signature*

City and state: Milwaukee, Wis

Hon. Stephen C. Dries, U.S. Magistrate
*Printed name and title*

I, Brian Ploch, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.        I make this affidavit in support of an application for a search warrant under Federal Rule of Criminal Procedure 41 and 18 U.S.C. §§ 2703(c)(1)(A) for information about the location of the cellular telephone assigned call number **(626) 991-9105** (the "Target Cell Phone 2" or "TCP2"), whose service provider is AT&T ("Service Provider") a wireless telephone service provider headquartered  at 11760 US Highway One, 6th Floor, North Palm Beach, FL 33408. The Target Cell Phone is described herein and in Attachment A, and the location information to be seized is described herein and in Attachment B.

2.        Because this warrant application seeks the prospective collection of information, including cell-site location information, that may fall within the statutory definitions of information collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), this affidavit includes references to an existing court-authorized "pen-trap device" for said Target Cell Phone.

3.        I have been employed with the Cudahy Police Department as a full time sworn police officer since June 2015.  I am currently assigned as a task force officer to the South Eastern Wisconsin Regional Gang Task Force (SWRGTF) and the Federal Bureau of Investigation (FBI) Milwaukee Field Office.  In June 2020, I was officially sworn in as a federal task force officer to work with the FBI's gang task force, which provides me with the authorization to present sworn affidavits in support of federal search warrants applications.  I have received training and have experience in the area of controlled substances investigations, money laundering, financial investigations, and various methods that drug dealers use in an effort to conceal and launder the

proceeds of their illicit drug trafficking enterprises. I have participated in numerous investigations involving violations of controlled substances laws to include other violations associated with the trafficking of controlled substance. I have participated in numerous drug investigations utilizing various means of investigation including but not limited to, a wire investigation, the execution of search warrants, the use of subpoenas, and the use of informants.

4. The facts in this affidavit come from my personal observations, my training and experience, my review of documents, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

5. Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841 and 846 (conspiracy to distribute controlled substance(s)) have been committed, are being committed, and/ or will be committed by Jose Avila (aka: "Jose Venegas"), Andrew Adupoku (aka: "Conchita") and other unknown persons. There is also probable cause to believe that the location information described in Attachment B will constitute evidence of these criminal violations, and will lead to the identification of individuals who are engaged in the commission of these offenses.

6. The court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711. Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated, *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

7. The Federal Bureau of Investigation (FBI) is investigating Jose Avila (aka: "Jose Venegas"), Andrew Adupoku (aka: "Conchita") and other unidentified persons involved in the Avila drug trafficking organization (DTO). The investigation to date has included traditional law

enforcement methods, including, but not limited to: interviews with confidential sources and sources of information; information from other law enforcement officers; documentary evidence; pen register, trap and trace, and telephone toll data; controlled buys of drugs, controlled meetings with targets, recorded telephone calls with targets, and controlled payments of money; and physical surveillance, and court-authorized consensual monitoring of one cellular telephone used by DTO members to facilitate their drug trafficking activities.

8.      Since on or about September 17, 2020, case agents have received information from a confidential source (hereinafter "CS#1") concerning the illegal drug trafficking activities of AVILA (methamphetamine, cocaine, and marijuana).

9.      CS#1 has conducted several, recorded conversations with AVILA, both in-person and on the telephone during the course of this investigation. CS#1 has facilitated shipments of methamphetamine, cocaine and marijuana from the AVILA DTO. CS#1's information regarding the AVILA DTO has been corroborated by information obtained from various public databases and law enforcement databases, physical surveillance, controlled drug purchases and money deliveries, and recorded conversations and phone calls with AVILA. CS#1's information has never been found to be false or misleading.

10.      Based upon my training and experience, I know that a "controlled buy" (and/or controlled contact) is a law enforcement operation in which an informant purchases drugs from a target. In this investigation, the traditional controlled buy is not possible due to known AVILA DTO targets' location outside the State of Wisconsin.  Therefore, case agents instruct CS#1 to order narcotics to be shipped to CS#1 from the AVILA DTO. Agents provide the target with an undercover, federally controlled post office box number as a delivery destination for the narcotics. Agents recover the narcotics and CS#1 never physically handles the narcotics. Agents then escort

CS#1 to financial institutions, provide CS#1 with pre-recorded buy money, and instruct CS#1 to electronically transfer the funds to the target account.

11.     CS#1 has a criminal history that includes convictions for robbery, burglary, narcotics, and sexual crimes. CS#1 is not receiving any consideration in connection with any pending case from the United States Attorney's Office and/or any State prosecution office for his/her cooperation with law enforcement. In September 2020, CS#1 voluntarily initiated contact with TFO Ploch and without prompting, CS#1 expressed his/her interest in providing information to law enforcement regarding the AVILA DTO. CS#1 told agents that cooperating with law enforcement will be sufficient self-motivation for CS#1 to avoid a return to past criminal behavior. CS#1 has also received monetary compensation in return for this information and assistance. For all the above reasons, case agents consider CS#1 to be reliable.

12.     On or about September 17, 2020, FBI SA Nicholas Rupnick and TFO Ploch met with CS#1.  During that meeting, CS#1 reported that he/she had recent contact with a person known as "JOSE VENEGAS." CS#1 knows "Jose VENEGAS" on a personal level from having spent time with "Jose VENEGAS" while they were together in the prison system. This initial contact occurred through Facebook Messenger. CS#1 showed SA Rupnick and TFO Ploch "Jose Venegas" Facebook profile page and username. Agents were able to identify "Jose Venegas" account as "Facebook.com/people/Jose-Venegas/100034749682525."

13.     CS#1 exchanged Facebook messages with "Jose VENEGAS" and eventually "Jose VENEGAS" instructed CS#1 to download WhatsApp so they could further communicate with one another. CS#1 downloaded WhatsApp, which is an end to end, encrypted messaging and voice calling application. CS#1 and "Jose VENEGAS" subsequently utilized WhatsApp to communicate. The WhatsApp account phone number for "Jose VENEGAS" is listed as (626) 629-0919 (TCP1).

14.     While in the presence of SA Rupnick and TFO ploch, CS#1 repeatedly discussed with "Jose VENEGAS" the shipment and sale of narcotics over WhatsApp messaging and WhatsApp phone calls. "Jose VENEGAS" told CS#1 that he was connected to high-level narcotics traffickers with the Sinaloa Cartel based out of Mexico. "Jose VENEGAS" asked CS#1 if he/ she would be willing to be a Midwest connection and assist in the trafficking of cocaine, methamphetamine and marijuana from California to Wisconsin. CS#1 was instructed to sell the narcotics and then transfer money back to "Jose VENEGAS."

15.     Case agents' review of law enforcement databases revealed "Jose VENEGAS" was an alias utilized by Jose L. AVILA (DOB: 12/23/1982). SA Rupnick obtained a photograph of AVILA from the California Department of Transportation (DOT). The DOT photo matched the photograph from the Facebook profile for "Jose VENEGAS." AVILA was previously convicted in a cocaine trafficking case and sentenced to a term of imprisonment. AVILA's listed address is 1521 West 60th Place, Los Angeles, California.

16.     United States Postal Inspector Scott Zimmerman secured a covert, federally controlled P.O. Box in Milwaukee, Wisconsin to be used as the delivery destination for controlled shipments of narcotics. CS#1 contacted AVILA via TCP1 and provided AVILA with said P.O. Box number. AVILA indicated he would send marijuana to CS#1.  CS#1 asked AVILA to ship the drugs to the name "Riley Smith."

17.     On or about September 30, 2020, CS#1 advised TFO Ploch that AVILA contacted CS#1 via WhatsApp / TCP1 to inform CS#1 that marijuana was delivered to the provided P.O. Box. Case agents subsequently retrieved the packages.

18.     According to Inspector Zimmerman, three (3) packages were shipped on September 29, 2020 from California to the controlled P.O. Box.  The shipping costs were paid for with Visa card number 4400668207155617, for a total of $187.65.

19.     Case agents examined the contents of said packages. The first package contained suspected marijuana that was tightly wrapped in cellophane and formed into the shape of a brick. This suspected marijuana field tested positive for the presence of THC with a total gross weight of approximately 978 grams. The second package contained suspected marijuana that was tightly wrapped in cellophane and formed into the shape of a brick.  The second package of suspected marijuana field tested positive for the presence of THC with a total gross weight of approximately 985 grams. The third package contained suspected marijuana that was tightly wrapped in cellophane and formed into the shape of a brick.  The third package of suspected marijuana field tested positive for the presence of THC with a total gross weight of approximately 959 grams.

20.     AVILA contacted CS#1 on WhatsApp from TCP1 and instructed CS#1 to wire or transfer the corresponding payment to AVILA through Venmo, Zelle and "Walmart to Walmart." CS#1 was unable to send the requested total payment due to transaction amount restrictions. CS#1 contacted AVILA and reported he/she was unable to wire or transfer the amount of money requested by AVILA.  AVILA then instructed CS#1 to electronically transfer the payment directly to AVILA's personal bank account.  AVILA identified his bank ("Bank of America"), the banking routing number (026009593), his account number (325124540163), the name on the account "Jose VENEGAS" and the listed address for the account (1521 West 60th Place, Los Angeles, California 90047). With the information provided by AVILA, CS#1 successfully transferred $12,000.00 dollars in pre-recorded FBI buy money to AVILA's personal bank account.

21.     After completing the money transfer, CS#1 and AVILA spoke via WhatsApp / TCP1.  AVILA indicated his satisfaction with the quick payment and initiated plans for CS#1 to fly to California to meet with AVILA.  AVILA further stated that he would be shipping a second package of marijuana to the controlled P.O. Box in Milwaukee, Wisconsin.

22.     On or about October 1st, 2020, the AVILA DTO shipped approximately six (six) pounds of marijuana to the controlled P.O. Box in Milwaukee, Wisconsin. Case agents seized the package on October 5th, 2020.  The package contained three tightly wrapped cellophane "bricks" containing suspected marijuana with a total gross weight of approximately 2,997.00 grams. The suspected marijuana field tested positive for THC.

23.     On or about October 8, 2020 Inspector Zimmerman advised case agents that another shipment arrived at the controlled P.O. Box in Milwaukee, Wisconsin.  The package was shipped on October 7, 2020 from California. The card used to pay for the $185.00 shipping cost was an INTERLINK (Visa) debit card #4815820306276724.  Case agents subsequently seized said package. The package contained three tightly wrapped cellophane "bricks" containing suspected marijuana with a total gross weight of approximately 2,094 grams.  The suspected marijuana field tested positive for THC.

24.     On or about October 9, 2020, under case agents' directions, CS#1 sent $2,000.00 in FBI pre-recorded buy money to AVILA via "Walmart to Walmart" wire transfer. The $2,000.00 was a partial payment for some of the marijuana fronted to CS#1.

25.     On October 9, 2020, United States Magistrate Judge Nancy Joseph issued an order authorizing the installation and use of a pen register / trap and trace device or process on the WhatsApp account phone number 626-629-0919 (TCP1). After serving said order on WhatsApp, case agents received call data pertaining to TCP1.  Said "pen-trap device" is currently providing call data to case agents.

26.     On or about October 13, 2020, under case agents' directions, CS#1 sent $10,000.00 in FBI pre-recorded buy money to AVILA via a direct transfer to AVILA's Bank of America account as described above.

27.     On or about October 14, 2020 CS#1 met with AVILA in Los Angeles, California. Case agents provided CS#1 with a covert recording device prior to contact with AVILA. AVILA picked up CS#1 in a black Jeep bearing California registration number 8LOD857, which lists to Teresa BAGDONAS at 506 El Camino Drive, Fullerton, California. AVILA drove CS#1 to 1521 W 60th Pl, Los Angeles, California. This was a known address associated with AVILA based on law enforcement databases and AVILA's provided banking information. Prior to CS#1's travel to California, case agents identified Edgar VALDEZ (DOB: 10/23/1985) as a possible resident of that address.

28.     Upon arriving at 1521 West 60th Place, Los Angeles, California, AVILA searched CS#1 and CS#1's property. He then instructed CS#1 to leave his phones in the vehicle. They walked to the front door of the house and AVILA preformed a unique knock on the front door. CS#1 identified Edgar VALDEZ as the individual who answered the door to the residence. VALDEZ was holding a large knife and began questioning CS#1 until AVILA informed VALDEZ that everything was fine.

29.     While inside the residence, AVILA discussed his drug trafficking plans with CS#1. AVILA advised CS#1 that he was going to provide the CS#1 with a clean and untraceable cell phone. AVILA stated that the phone should only be used for contacting AVILA and other members of AVILA's organization should they call it. AVILA informed CS#1 that he cleans his drug proceeds via electronic gambling machines he places throughout the city (Los Angeles) and a massage parlor which is actually a front for prostitution. AVILA told CS#1 he wanted to start with small shipments of methamphetamine to CS#1 and would re-evaluate future quantities if CS#1 is able to sell the methamphetamine quickly.

30.     AVILA stated that he was going to meet his uncle, who AVILA claims is a member of the Sinaloa Drug Cartel. AVILA told CS#1 that CS#1 could back out now, but once

their DTO business in Milwaukee is running, CS#1 cannot leave the business or the cartel will kill CS#1. CS#1 assured AVILA that CS#1 is committed.

31.     On or about October 15, 2020, AVILA picked up CS#1 from CS#1's hotel. CS#1 and AVILA further discussed prices for cocaine and methamphetamine. AVILA told CS#1 that he was working with another connection in the Detroit, Michigan area. AVILA assured CS#1 that his product was pure and the best quality. AVILA told CS#1 that his uncle was happy with CS#1 and would meet CS#1 in either California or Mexico at a later date.

32.     AVILA drove CS#1 to the area of 11003 La Brea Street, Los Angeles, California. AVILA indicated he utilizes the location to launder money. According to CS#1, the business is publicly identified as an acupuncture office, but it was actually a prostitution business. AVILA told CS#1 that the business is run by "Angel COLATO."

33.     AVILA and CS#1 discussed the phone that AVILA would provide CS#1. AVILA stated that his partner creates these phones so they cannot be tracked by law enforcement. He instructed CS#1 that the DTO phone should be utilized for business calls only between CS#1, AVILA, and other DTO members.

34.     AVILA drove CS#1 to CS#1's hotel. At the hotel, AVILA asked CS#1 for pre-payment for the methamphetamine. CS#1 stated he/ she would not provide money until CS#1 saw the product. AVILA assured CS#1 he would bring product for CS#1 to see tomorrow. AVILA further stated he would introduce CS#1 to the packager/ shipper he uses to send narcotics via the mail. CS#1 gave AVILA $4,000 in FBI pre-recorded buy money and exited AVILA's vehicle.

35.     On or about October 16, 2020, AVILA picked up CS#1 in the above-described Jeep. AVILA showed CS#1 approximately 4 ounces of suspected crystal methamphetamine. Additionally, AVILA had a black duffel bag in the Jeep with what CS#1 estimated to be 10lbs of

marijuana. AVILA bragged that CS#1 should not worry and AVILA has all the connections CS#1 will need. AVILA explained that he would ship the methamphetamine and marijuana to CS#1.

36.     AVILA then told CS#1 that they were going to meet "Conchita." AVILA stated that "Conchita" is a young guy who is an expert at shipping narcotics in the mail. According to AVILA several people utilize "Conchita's" service to ship narcotics across the country. AVILA drove CS#1 and the narcotics to the area of 1227 Miramar Street, Los Angeles California. AVILA placed a phone call from his personal phone to a number listed as "Conchita" prior to their arrival. AVILA pulled next to a vehicle and then turned over the methamphetamine and marijuana to "Conchita," who was seated in said vehicle.

37.     AVILA gave CS#1 a black flip phone which was to be utilized for communication. AVILA told CS#1 to make sure he sends money or the Cartel members will kill CS#1. AVILA asked CS#1 to find new ways of cleaning and sending money. Finally, AVILA asked CS#1 to pick up money from other drug dealers on AVILA's behalf and transport the money to Mexico. CS#1 stated he/ she would consider that in the future.

38.     On or about October 20, 2020 Inspector Zimmerman advised case agents that a shipment from California was delivered to the controlled P.O. Box in Milwaukee, Wisconsin. Case agents seized the shipment and examined its contents. The package contained one (1) plastic bag of suspected crystal methamphetamine, which field tested positive for methamphetamine and had a total gross weight of approximately 147 grams. Also included in this shipment was a second package addressed to the controlled P.O. Box in Milwaukee. This second package was found to contain five (5) tightly wrapped cellophane "bricks" of suspected marijuana. The "bricks" of suspected marijuana field tested positive for THC with a total gross weight of approximately 2779 grams. This shipment is consistent with the narcotics AVILA showed CS#1 while they were together in California.

39.    On or about October 21, 2020, case agents met with CS#1 to transfer money to AVILA as a partial payment for marijuana previously shipped to the controlled P.O. Box in Milwaukee, Wisconsin.   CS#1 electronically transferred $5,000 in FBI pre-recorded buy money to AVILA's Bank of America account.

40.    On or about October 26, 2020, case agents met with CS#1 to transfer money to AVILA as a partial payment for marijuana previously shipped to the controlled P.O. Box in Milwaukee, Wisconsin. CS#1 electronically transferred $2,200 in pre-recorded FBI buy money to AVILA's Bank of America account.

41.    On or about October 29, 2020, Inspector Zimmerman advised case agents that a shipment from California was delivered to the controlled P.O. Box in Milwaukee, Wisconsin. Case agents seized the shipment and examined the contents.  The parcel contained five (5) tightly wrapped cellophane "bricks" of suspected marijuana.  The "bricks" of suspected marijuana field tested positive for THC and had a total gross weight of approximately 2586 grams.

42.    On or about October 30, 2020, under case agents' direction, CS#1 sent $1,200  in pre-recorded FBI buy money to AVILA via "Walmart to Walmart" money transfer. This payment was partial payment for debt owed to AVILA from previous shipments of narcotics fronted by AVILA.

43.    On November 2, 2020, Inspector Zimmerman received security surveillance video footage pulled from the Griffith Post Office located at 3370 Glendale Boulevard, Los Angeles, California 90039. The video contained footage of the individual who sent several of the narcotics packages to the controlled P.O. Box in Milwaukee, Wisconsin.

44.    On November 5, 2020, United States Magistrate Judge William Duffin issued an order authorizing the installation and use of a pen register / trap and trace device or process on the Verizon phone number 626-629-0919 (TCP1). After serving said order on Verizon, case

agents received call data pertaining to TCP1. Said "pen-trap device" is currently providing call data to case agents.

45.     On or about November 14, 2020, AVILA communicated through the cell phone he provided to CS#1 during CS#1's California visit. The call was intercepted via an active consensual wire intercept.   During the call, AVILA told CS#1 that he will contact his people to secure a shipment of cocaine and would send the cocaine through the mail soon. AVILA stated his suppliers don't want to break down smaller amounts of cocaine for shipment. AVILA also asked CS#1 about Bitcoin as a follow-up to prior discussions regarding AVILA's interest in setting up a more efficient way to clean and send money. After the call, AVILA and CHS#1 have since reverted to WhatsApp / TCP1 as their primary communication platform.

46.     On or about November 20, 2020, Inspector Zimmerman notified case agents of a shipment from California delivered to the controlled P.O. Box in Milwaukee, Wisconsin.  Case agents seized the shipment and examined its contents.  The package contained one (1) tightly wrapped cellophane "brick" of suspected cocaine.  The suspected cocaine field tested positive for the presence of cocaine with a total gross weight of approximately 108 grams.

47.     On or about November 27, 2020, case agents met with CS#1 in order to send money to AVILA. CS#1 electronically transferred $13,000 in pre-recorded FBI buy money to AVILA's Bank of America account.  These funds were payment for the cocaine received on November 20, 2020 and a partial payment for an outstanding marijuana debt.

48.     According to information gathered by case agents from AVILA's subpoenaed Bank of America records, AVILA received $23,439.00 in deposits between September 18, 2020 and November 19, 2020. The records show seven (7) Zelle money transfer to an individual listed as "Drew negro Conchita" totaling $950.00.  Based on the nickname "Drew" it was suspected

"Conchita's" first name might be "Drew" or "Andrew." Further, there were money transfer deposits from the name "Andrew Adupoku."

49.     Case agents reviewed data pertaining to TCP1 calls made during the date and time AVILA called "Conchita" while AVILA was with CS#1. One of the numbers listed in that time frame is (626) 991-9105. Through an open source internet search, case agents learned (626) 991-9105 lists to "Erica Adupoku" and the service provider is AT&T. Open source information also revealed that "Andrew Adupoku" is a listed relative of "Erica Adupoku." Phone number (626) 991-9105 is hereinafter referred to as "Target Cell Phone 2" or "TCP2."

50.     Case agents obtained a California DOT photo of "Andrew Adupoku" and compared it to the surveillance images of the individual who on at least three occasions shipped narcotics from California to the controlled P.O. Box in Milwaukee, Wisconsin. Based on the California DOT photo comparison to the video footage, the DOT physical descriptors listed for "Andrew Adupoku," and AVILA's Bank of America records, case agents identified "Conchita" as Andrew K. ADUPOKU (DOB: 10/01/1996). ADUPOKU's listed address is 2213 Calle Taxco, West Covina, California.

51.     Case agents requested phone toll and official subscriber information from AT&T for phone number TCP2, which is utilized by Andrew ADUPOKU (aka: "Conchita"). Case agents reviewed tolls for TCP1 (AVILA) and compared calls between TCP1 and TCP2 (ADUPOKU). In total there were 27 contacts between TCP1 and ADUPOKU's TCP2 phone during the subpoenaed timeframe (September 29, 2020 and November 2, 2020).

52.     AVILA's TCP1 is listed as a Verizon phone number. Furthermore, the subscriber for the phone is Teresa BAGDONAS. AVILA was observed in California operating BAGDONAS' vehicle while in California. Through training and experience it is common for

drug traffickers to put assets and subscriptions in other people's names in order to avoid detection and/ or identification.

53.     Through Law Enforcement databases, ADUPOKU's TCP2, is listed as an AT&T phone number with a subscriber of Erika Adupoku. Erika Adupoku is a relative of ADUPOKU. Through training and experience it is common for drug traffickers to put assets and subscriptions in other people's names in order to avoid detection and/ or identification.

54.     On September 29, 2020, the AVILA DTO shipped a package containing marijuana from California to the controlled P.O. Box in Milwaukee, Wisconsin. On September 29, 2020, Avila paid ADUPOKU $220.00 via a Zelle money transfer. There was a documented phone call between ADUPOKU's TCP2 and AVILA's TCP1 on September 29, 2020 as well.

55.     On October 1, 2020, the AVILA DTO shipped a package of narcotics from California to the controlled P.O. Box in Milwaukee, Wisconsin. On October 5, 2020, Avila paid ADUPOKU $300.00 via Zelle money transfer. There are documented phone calls between AVILA's TCP1 and ADUPOKU's TCP2 on September 29, 2020 and October 5, 2020.

56.     On October 7, 2020, the AVILA DTO shipped a package of narcotics from California to the controlled P.O. Box in Milwaukee, Wisconsin.  On October 7, 2020, AVILA paid ADUPOKU $100.00, $85.00 and $15.00 via Zelle money transfer. There are documented calls between AVILA's TCP1 and ADUPOKU's TCP2 on October 6, 2020 and October 8, 2020. On October 13, 2020 AVILA paid AKUPOKU $300.00 via Zelle money transfer. There is a documented call between AVILA's TCP1 and ADUPOKU's TCP2 on October 13, 2020. This transfer correlated with CS#1's $10,000 payment to AVILA for outstanding drug debts.

57.     On October 20, 2020, case agents seized a package containing marijuana and methamphetamine shipped from California to the controlled P.O. Box in Milwaukee, Wisconsin. CS#1 was with AVILA when the marijuana and methamphetamine were turned over to

ADUPOKU on October 16, 2020. On October 15, 2020 AVILA paid AKUPOKU $100.00. On October 19, 2020 AVILA sent ADUPOKU an additional $50.00 via Zelle money transfer. There are documented calls between AVILA's TCP1 and ADUPOKU's TCP2 on October 15, 2020 and October 16, 2020.

58.    On or about December 03, 2020, case agents met with CS#1 in order to send a drug payment money to AVILA. CS#1 electronically transferred $5,000 in pre-recorded FBI buy money to AVILA's Bank of America account.

59.    On December 7, 2020, United States Magistrate Judge Stephen Dries issued an order authorizing the installation and use of a pen register / trap and trace device or process on the AT&T phone number 626-991-9105 (TCP2). After serving said order on AT&T, case agents received call data pertaining to TCP2.  Said "pen-trap device" is currently providing call data to case agents.

60.    In my training and experience, I have learned that the Service Provider is a company that provides cellular communications service to the general public. I also know that providers of cellular communications service have technical capabilities that allow them to collect and generate information about the locations of the cellular devices to which they provide service, including cell-site data, also known as "tower/face information" or "cell tower/sector records." Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular device and, in some cases, the "sector" (i.e., faces of the towers) to which the device connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data provides an approximate general location of the cellular device.

## Cell-Site Data

61.    Based on my training and experience, I know that the Service Provider can collect cell-site data on a prospective basis about the Target Cell Phone. Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer was connected at the end of the communication; and (5) the duration of the communication. I also know that wireless providers such as the Service Provider typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes.

## E-911 Phase II / GPS Location Data

62.    I know that some providers of cellular telephone service have technical capabilities that allow them to collect and generate E-911 Phase II data, also known as GPS data or latitude-longitude data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. As discussed above, cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data. Based on my training and experience, I know that the Service Provider can collect E-911 Phase

II data about the location of the Target Cell Phone, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available.

## Subscriber Information

63.     Based on my training and experience, I know that wireless providers such as the Service Provider typically collect and retain information about their subscribers in their normal course of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the Service Provider typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the Target Cell Phone's user or users and may assist in the identification of co-conspirators and/or victims.

## AUTHORIZATION REQUEST

64.     Based on the foregoing, I request that the Court issue the proposed warrant, pursuant to 18 U.S.C. § 2703(c) and Federal Rule of Criminal Procedure 41.

65.     I further request that the Court direct the Service Provider to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control.

66.     I also request that the Court direct the Service Provider to furnish the government all information, facilities, and technical assistance necessary to accomplish the

collection of the information described in Attachment B unobtrusively and with a minimum of interference with the Service Provider's services, including by initiating a signal to determine the location of the Target Cell Phone on the Service Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall reasonably compensate the Service Provider for reasonable expenses incurred in furnishing such facilities or assistance.

67.     I further request, pursuant to 18 U.S.C. § 3103a(b) and Federal Rule of Criminal Procedure 41(f)(3), that the Court authorize the officer executing the warrant to delay notice until **30 days** after the collection authorized by the warrant has been completed. There is reasonable cause to believe that providing immediate notification of the warrant may have an adverse result, as defined in 18 U.S.C. § 2705. Providing immediate notice to the subscriber or user of the Target Cell Phone would seriously jeopardize the ongoing investigation, as such a disclosure would give that person an opportunity to destroy evidence, change patterns of behavior, notify confederates, and flee from prosecution. *See* 18 U.S.C. § 3103a(b)(1). As further specified in Attachment B, which is incorporated into the warrant, the proposed search warrant does not authorize the seizure of any tangible property. *See* 18 U.S.C. § 3103a(b)(2). Moreover, to the extent that the warrant authorizes the seizure of any wire or electronic communication (as defined in 18 U.S.C. § 2510) or any stored wire or electronic information, there is reasonable necessity for the seizure for the reasons set forth above. *See* 18 U.S.C. § 3103a(b)(2).

68.     Because the warrant will be served on the Service Provider, who will then compile the requested records at a time convenient to it, reasonable cause exists to permit the execution of the requested warrant at any time in the day or night.

**<u>ATTACHMENT A</u>**

**Property to Be Searched**

1. Records and information associated with the cellular device assigned call number (626) 991-9105 (referred to herein and in Attachment B as "the Target Cell Phone 2"), with listed subscriber(s) Erica Adupoku that is in the custody or control of AT&T, (referred to herein and in Attachment B as the "Provider"), a wireless communications service provider that is headquartered 11760 US Highway One, 6th Floor, North Palm Beach, FL 33408.

2. The Target Cell Phone 2.

<u>**ATTACHMENT B**</u>

**Particular Things to be Seized**

**I.     Information to be Disclosed by the Provider**

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, including any information that has been deleted but is still available to the Provider or that has been preserved pursuant to a request made under 18 U.S.C. § 2703(f), the Provider is required to disclose to the government the following information pertaining to the Account listed in Attachment A:

a.   The following subscriber and historical information about the customers or subscribers associated with the Target Cell Phone 2 for the time period **September 17, 2020 through present:**

i.   Names (including subscriber names, user names, and screen names);

ii.   Addresses (including mailing addresses, residential addresses, business addresses, and e-mail addresses);

iii.   Local and long distance telephone connection records;

iv.   Records of session times and durations, and the temporarily assigned network addresses (such as Internet Protocol ("IP") addresses) associated with those sessions;

v.   Length of service (including start date) and types of service utilized;

vi.   Telephone or instrument numbers (including MAC addresses, Electronic Serial Numbers ("ESN"), Mobile Electronic Identity Numbers ("MEIN"), Mobile Equipment Identifier ("MEID"); Mobile Identification Number ("MIN"), Subscriber Identity Modules ("SIM"), Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"); International Mobile Subscriber Identity Identifiers ("IMSI"), or International Mobile Equipment Identities ("IMEI");

vii.   Other subscriber numbers or identities (including the registration Internet Protocol ("IP") address); and

viii.   Means and source of payment for such service (including any credit card or bank account number) and billing records.

2

ix. All records and other information (not including the contents of communications) relating to wire and electronic communications sent or received by the Target Cell Phone 2, including:

(A) the date and time of the communication, the method of the communication, and the source and destination of the communication (such as the source and destination telephone numbers (call detail records), email addresses, and IP addresses); and

(ii) information regarding the cell tower and antenna face (also known as "sectors" through which the communications were sent and received) as well as per-call measurement data (also known as "real-time tool" or "RTT").

b. Information associated with each communication to and from the Target Cell Phone 2 for a period of up to 30 days from the date of this warrant, including:

i. Any unique identifiers associated with the cellular device, including ESN, MEIN, MSISDN, IMSI, SIM, or MIN;

ii. Source and destination telephone numbers;

iii. Date, time, and duration of communication; and

iv. All data about the cell towers (i.e. antenna towers covering specific geographic areas) and sectors (i.e. faces of the towers) to which the Target Cell Phone 2 will connect at the beginning and end of each communication, as well as per-call measurement data.

The Court has also issued an order pursuant to 18 U.S.C. § 3123, dated today, for such information associated with the Target Cell Phone 2.

c. Information about the location of the Target Cell Phone 2 for a period of 30 days, during all times of day and night. "Information about the location of the Subject Phone" includes all available E-911 Phase II data, GPS data, latitude-longitude data, and other precise location information.

i. To the extent that the information described in the previous paragraph (hereinafter, "Location Information") is within the possession, custody, or control of the Provider, the Provider is required to disclose the Location Information to the government. In addition, the Provider must furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the Location Information unobtrusively and with a minimum of interference with the Provider's services, including by initiating a signal to determine the location of the Target Cell

Phone 2 on the Provider's network or with such other reference points as may be reasonably available, and at such intervals and times directed by the government. The government shall compensate the Provider for reasonable expenses incurred in furnishing such facilities or assistance.

ii. This warrant does not authorize the seizure of any tangible property. In approving this warrant, the Court finds reasonable necessity for the seizure of the Location Information. *See* 18 U.S.C. § 3103a(b)(2).

## II.    Information to be Seized by the Government

All information described above in Section I that constitutes evidence, fruits, contraband, and instrumentalities of violations of  21 U.S.C. §§ 841 and 846 , involving Jose AVILA, Andrew ADUPOKU and unidentified subject(s) during the period September 17, 2020 through present.

Law enforcement personnel (who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, agency personnel assisting the government in this investigation, and outside technical experts under government control) are authorized to review the records produced by the Provider in order to locate the things particularly described in this Warrant.

## CERTIFICATE OF AUTHENTICITY OF DOMESTIC RECORDS PURSUANT TO FEDERAL RULES OF EVIDENCE 902(11) AND 902(13)

I, _____, attest, under penalties of perjury by the laws of the United States of America pursuant to 28 U.S.C. § 1746, that the information contained in this certification is true and correct. I am employed by _____**.** ,and my title is _____. I am qualified to authenticate the records attached hereto because I am familiar with how the records were created, managed, stored, and retrieved. I state that the records attached hereto are true duplicates of the original records in the custody of _____**.** The attached records consist of _____

**[GENERALLY DESCRIBE RECORDS (pages/CDs/megabytes)]**. I further state that:

a.     all records attached to this certificate were made at or near the time of the occurrence of the matter set forth by, or from information transmitted by, a person with knowledge of those matters, they were kept in the ordinary course of the regularly conducted business activity of _____ and they were made by _____ as a regular practice; and

b.     such records were generated by _____electronic process or system that produces an accurate result, to wit:

1.     the records were copied from electronic device(s), storage medium(s), or file(s) in the custody of _____ in a manner to ensure that they are true duplicates of the original records; and

2.     the process or system is regularly verified by _____ and at all times pertinent to the records certified here the process and system functioned properly and normally.

I further state that this certification is intended to satisfy Rules 902(11) and 902(13) of the Federal Rules of Evidence.

_____          _____
Date                                    Signature